IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita Leeson Weinshienk

Civil Action No. 09-cv-02351-ZLW

CAROLYN R. SHAW,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.
_____

ORDER
_____

      Plaintiff appeals the June 27, 2007, written decision of Administrative Law Judge

Alexander Weir III (ALJ) denying her claim for Social Security Supplemental Security

Income Benefits (SSI) and Disability Insurance Benefits (DIB).  The Appeals Council

denied review (R. 6-8), and this appeal was timely filed.

      This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  The Court has

determined that the appeal can be resolved on the parties' briefing and that no oral

argument is necessary.

**BACKGROUND**

      **A.    Personal History, Alleged Disability, and Filing of Claims**

      Plaintiff was born on February 2, 1965, and lives in Pueblo, Colorado.  (R. 46,

474).  As of May 2005, Plaintiff lived in a mobile home with her two sons, aged 8 and

17. (R. 96). Plaintiff completed the eleventh grade and received her GED. (R. 484). She also has a diploma in cosmetology. (R. 484).

Plaintiff filed an application for SSI and DIB benefits on January 11, 2005, alleging that she had become disabled five years prior, on February 12, 2000, after being injured in a car accident. (R. 46-48, 260). Plaintiff alleges that she suffers from lower back pain, weakness in her right hand, migraine headaches, depression, and plantar fasciitis. (R. 94, 439, 490-502).

Plaintiff's initial application was denied on June 14, 2005. (R. 35). Plaintiff timely filed a request for her case to be heard by an ALJ. (R. 33). After the ALJ issued an unfavorable decision on Plaintiff's application, Plaintiff filed a Request for Review by the Appeals Council, which was denied on August 20, 2009. (R. 6-8).

### B.    Work History

Plaintiff held a variety of jobs prior to 2000, including school bus driver, security guard, telemarketer, and grocery store cashier. (R. 507-510). Plaintiff stated on her Work History Report that she worked eight hours per day, five days per week as a personal care provider from 1990-2004. (R. 76). Plaintiff stated that in this job she frequently lifted 50 pounds or more and occasionally lifted 100 pounds or more. (R. 77). Plaintiff also stated that after February 12, 2000, she missed alot of work due to her medical problems and had to cut her hours. (R. 83). She stated that she stopped working on April 24, 2004, because her medical problems made it difficult to work. (R.

83).  Plaintiff's earnings records indicate that Plaintiff earned $1,843 in 2001, $9,208 in

2002, $6,904 in 2003, $2,977 in 2004, and $433.19 in 2005.

### C.    Medical History

The following summarizes the relevant medical history supplied in the Record.

Records from Anthony Ortegon, MD dated February 16, 2000, note that Plaintiff had

been in a car accident while fleeing police on February 11, 2000, and had gone to the

emergency room on February 12, 2000 due to shoulder and neck pain and headache.

(R. 260).  Plaintiff stated that she had previously experienced migraines but that they

were now aggravated, and Dr. Ortegon restarted her on Prozac 20 mg/day for the

migraines.  (R. 260).  Dr. Ortegon also prescribed an anti-inflammatory (Vioxx), kept her

on the muscle relaxant prescribed by the ER, and prescribed an additional muscle

relaxant (Valium).  He increased the dosage of Ultram that had been prescribed by the

ER, and gave her shots of Toradol (a pain medication) and Dexamethasone (an anti-

inflammatory).  (R. 259).

On February 25, 2000, Dr. Ortegon noted that Plaintiff "is not doing very well and

is under a lot of stress and pain."  He noted that "the Ultram and Valium were not

helping so I gave her Vicodin, that did not help either.  The problem is that we have to

control the stress.  She is under a lot of stress with her family and husband so there is

[sic] a lot of psychosocial problems but we first need to control her."  (R. 259).  Dr.

Ortegon put her on Elavil 50 HS (an anti-depressant) "to help her sleep and also [gave]

her samples of Buspar [an anxiety medication]."  Dr. Ortegon concluded by noting, "I

3

think we are getting confused with the meds," and said that he wanted Plaintiff to bring in all of her pills at her next appointment.  (R. 259).

On March 3, 2000, Plaintiff saw Dr. Ortegon, who noted that Plaintiff was "much better and calmed down."  Dr. Ortegon stated that Plaintiff "[h]as a lot of pain still but I think she will slowly improve now."  (R. 258).

On March 22, 2000, Dr. Ortegon reported that Plaintiff came in and was "feeling good, mentally she is fine.  Her depression is under excellent control with Prozac, Elavil and Buspar."  He stated that "[h]er back pain still bothers her from the car accident . . . I have taken her off work and will wait and see how she improves from her back pain." (R. 258).  On April 5, 2000, Plaintiff reported to Dr. Ortegon that she was still having back and neck pain.  Dr. Ortegon told her that the pain is muscular and that she needs to go to physical therapy.  (R. 257).  On May 5, 2000, Plaintiff reported that her lower back pain was much better, but her neck still bothers her.  Plaintiff had not yet gone to physical therapy.  (R. 257).

In August of 2000 Plaintiff reported left hip pain to Dr. Ortegon.  Dr. Ortegon suspected arthritis, and prescribed Motrin and continued Dexamethasone and Toradol shots.  (R. 255).  On September 6, 2000, Plaintiff reported that she was still having a lot of pain in her left hip although the shots "really control the pain."  (R. 255).  Plaintiff continued to receive periodic shots for hip pain in September 2000.  (R. 254).

On October 6, 2000, Dr. Ortegon stated that Plaintiff was "feeling a lot better and looks a lot better."  Plaintiff was still having trouble sleeping, and Dr. Ortegon told her to

4

increase her Elavil if necessary.  (R. 254).  Later that month, Plaintiff complained of

gastritis, diarrhea, and a migraine.  (R.  253).  However, Dr. Ortegon noted that

Plaintiff's stress/depression was "under good control with meds."  (R. 253).  On January

3, 2001, Dr. Ortegon noted that Plaintiff "is doing very well."  He stated that her neck

and shoulder pain were "doing well," that her depression was stable, and that her

migraines were not bothering her very much.  (R. 251).

Plaintiff continued to see Dr. Ortegon until December 2002, complaining

intermittently of back pain which she stated was controlled by the shots administered by

Dr. Ortegon.  (See e.g. R. 248).  Plaintiff stopped seeing Dr. Ortegon for a period

beginning in December 2002, and was seen instead by a health clinic (apparently

Southwest Medical Center).  (R. 242).  On May 12, 2004, Dr. Ortegon saw Plaintiff

again, noting that she has "chronic pain syndrome."  (R. 242).  Dr. Ortegon stated that

Plaintiff had been "doing very well" when she was taking medications and receiving

shots for pain, but had gotten worse under the clinic's care because the clinic wouldn't

give her pain shots.  (R. 242).  Dr. Ortegon stated that Plaintiff "is 100 percent disabled."

(R. 242).

On June 4, 2004, Dr. Ortegon noted that Plaintiff's "pain is much better.  She is

relaxing.  She is feeling better.  The trick was the antidepressants."  (R. 241).

On June 10, 2004, Plaintiff was seen by chiropractor Robert J. Graham, D.C., of

the Pueblo Chiropractic Center.  (R. 291-293).  He reported his impression of "[c]hronic

bilateral lumbar spine myofasciitis and facet dysfunction secondary to motor vehicle

accident." (R. 293). An August 2, 2004, Independent Medical Examination report from

chiropractor Gloria De La Vara, D.C., states that Plaintiff reported left trapezius pain and

lower back pain and stiffness. De La Vera opined that Plaintiff's current residual soft

tissue discomfort is not due to her prior motor vehicle accident but rather to her lack of

aerobic exercise and high intake of nicotine for many years. (R. 233).

Records from Roger Narvaez, M.D. at Southwest Medical Center, Inc. dated July

14, 2004, state that Plaintiff came to Southwest reporting that she had been

experiencing migraine headaches and neck pain for quite some time. (R. 167). Dr.

Narvaez ordered an MRI of Plaintiff's brain. (R. 167). The MRI results were normal.

(R. 165). She was instructed to limit her caffeine intake, stop smoking, and take

ibuprofin for her neck pain and headaches. (R. 165).

An August 4, 2004, letter from Dr. Ortegon to the Colorado Department of

Human services states, "[b]asically, [Plaintiff] has chronic pain. She becomes under

good control with therapy and taking her medication." He stated, "[h]er main disability is

the chronic pain; however, she has significant depression. She also has GERD, high

blood pressure, and migraines. She does very well when she is controlled with her

medications, but I think she does have a definite disabling problem." (R. 239).

On August 6, 2004, Dr. Ortegon noted that "[t]he pain continues to improve." (R.

240). At that point Plaintiff was taking Soma (a muscle relaxant), Elavil (an anti-

depressant), Remeron (an anti-depressant), and Darvocet (a painkiller), and was

receiving Dexamethasone and Toradol shots.  (R. 240).  Dr. Ortegon asked Plaintiff to

"bring in all of her pills next time."  (R. 240).

On October 6, 2004, state agency physician Alan Ketelhorn, M.D. completed a

Physical Residual Functional Capacity form for Plaintiff.  Among other things, Dr.

Ketelhorn concluded that Plaintiff can stand and/or walk, with normal breaks, about six

hours in an eight-hour workday, and can sit, with normal breaks, about six hours in an

eight-hour workday.  (R. 360).

On April 8, 2005, Plaintiff was examined by psychologist David C. Hopkins,

Ph.D., upon a referral from the Division of Vocational Rehabilitation.  (R. 329-332).

After examination, Dr. Hopkins concluded that Plaintiff

> is functioning in the average range of intelligence without
> clinically significant [sic] but with subjective memory and
> concentration deficits.  She does present with a mild
> depression with mild to moderate anxiety in the face of a fair
> amount of situational stress.  She also presents with a
> chronic pain profile, which has resulted from a motor vehicle
> accident of February 12, 2000, and for which she is still
> receiving some treatment . . . .  [H]er MMPI would suggest a
> psychological overlay to her pain complaints, which are more

than likely exacerbated by her stress and include a muscle tension component.  She is
currently taking psychotropic medications and these seem to be working fairly well.

(R. 331).  Dr. Hopkins stated that Plaintiff "appears to have the intellectual and cognitive

abilities to function adequately in the job market and should do well in junior college."

(R. 332).  He diagnosed Plaintiff with adjustment disorder with anxiety and depression,

pain disorder with psychological and medical factors, and multiple physical problems

with pain.  (R. 332).  He recommended biofeedback sessions, relaxation training, and

psychotherapy, and no changes to Plaintiff's antidepressant medication.  (R. 332).

On April 25, 2005, Angelo Giarratano, D.P.M., a podiatrist, diagnosed Plaintiff with plantar fasciitis in her right heel.  (R. 337).  Dr. Giarratano administered a cortisone injection.  Two months later, Plaintiff reported that the pain in her heel had "subsided quite a bit."  (R. 435).  On June 21, 2006, Plaintiff saw Dr. Giarratano again, complaining of pain in her right heel.  Dr. Giarratano noted that Plaintiff "didn't comply and F/U with her visits."  (R. 434).  On July 3, 2006, Dr. Giarratano gave her cortisone injections in both heels.  (R. 434).

State Agency medical consultant Janet Weldon, who is not a physician, completed a Physical Residual Functional Capacity Assessment form on June 8, 2005.  (R. 373-380).  Ms. Weldon stated on the form that Plaintiff can occasionally lift 20 pounds, can frequently lift 10 pounds, can stand and/or walk for about six hours in an eight-hour workday, and can sit for a total of about six hours in an eight-hour workday.  (R. 374).  She stated that Dr. Ortegon's conclusions about Plaintiff's limitations were significantly different from her findings because "Dr. Ortegon offered the opinion that claimant has a significant disability.  His opinion is reserved to the commissioner."  (R. 379).

On June 10, 2005, Dr. Ortegon noted that Plaintiff "is doing very well . . . .  Her generalized aches and pains and chronic pain syndrom are more or less better."  (R. 435).  "Review of systems is negative.  She seems to be doing well otherwise."  (R.

435).  Despite these conclusions, after noting that Plaintiff was applying for disability,

Dr. Ortegon stated, "I feel that she is disabled."  (R. 435).

On February 8, 2006, Dr. Ortegon stated on a Colorado DHS Initial Examination

form that Plaintiff has "no work capacity."  (R. 436-437).  On September 21, 2006, he

stated in a letter "To Whom It May Concern" that Plaintiff has multiple medical problems

and is "only able work 8-10 hours per week."  (R. 423).

State Agency physician Donald Glasco, M.D. completed a Psychiatric Review

Technique form on June 14, 2005.  (R. 381-394).  Dr. Glasco stated that Plaintiff has

non-severe depression (R. 383-384), with no restriction on activities of daily living, mild

difficulties in maintaining social functioning, and mild difficulties in maintaining

concentration, persistence, or pace.  (R. 391).  He stated that Plaintiff currently is being

treated with medications which are working well.  (R. 393).

Dr. Hopkins wrote to Dr. Ortegon on December 8, 2006, stating that Plaintiff had

called him that day stating that she was having racing thoughts, anxiety, and anger, and

was feeling desperate, although she was not suicidal.  (R. 413).  He noted that Plaintiff

"has multiple situational crises on a regular basis and seems to have some features of

borderline personality disorder."  Dr. Hopkins stated that Plaintiff has been "non

compliant with the Lexapro because she does not like the side effects."  He suggested

Zoloft, since Plaintiff reported no side effects with that medication in the past, or

perhaps lithium or Trileptal.  He stated that his testing did not indicate an organic brain

disorder and pointed toward a personality disorder.  He concluded that "[b]ased on

[Plaintiff's] presentation and her inability to manage her job, I would support her application for permanent and total disability.  This may give her some stability to help her with the emotional problems she is having."  (R. 413).

On December 11, 2006, Dr. Ortegon reported that Plaintiff "is still falling apart. She was given some Xanax, but she did not take the Lexapro.  I gave her a long lecture about her depression and her problems, that she needs to take the Lexapro.  We will restart that today, increase it from 10 mcg to 20 mcg."  (R. 418).

On December 29, 2006, Dr. Ortegon filled out a form stating that Plaintiff can lift less than 10 pounds, can sit for four hours in an eight-hour workday, and can be on her feet for less than half an hour in an eight-hour workday.  (R. 415).  He stated that Plaintiff has weekly migraine headaches that last from eight to 24 hours, and that Plaintiff would not be able to function on the job while experiencing a headache.  (R. 417).  He also stated that he was treating Plaintiff for depression.  (R. 417).

Although Plaintiff apparently did not see Dr. Giarratano again after her July 3, 2006, appointment, on March 19, 2007, Dr. Giarratano filled out a form on which he stated that Plaintiff can be on her feet for two to three hours in an eight-hour workday, "or to tolerance."  (R. 439).  He also indicated, however, that he did not know whether Plaintiff's last cortisone injection, eight months prior, had been successful or not, since Plaintiff "has not followed up on her therapy."  (R. 439).

Dr. Hopkins completed a Residual Functional Capacity Evaluation (Mental) of Plaintiff in April 4, 2007.  He stated that Plaintiff had either no limitations, slight

limitations, or moderate limitations in all categories except "[t]he ability to maintain

socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness," "[t]he ability to respond appropriately to changes in the work setting," and

"[t]he ability to set realistic goals or make plans independently of others," for which he

stated that Plaintiff has "marked" limitations.  (R. 460-61).

### D.    Plaintiff's Function Report

Plaintiff filled out an SSA Function Report form in May 2005.  (R. 95-102).  She

stated on the form that during the day she visits her mother next door, reads the paper,

and uses the phone.  She then goes to doctors' appointments, or, on bad pain days,

rests, takes her medications, and stays home.  She and her family cook meals and

clean up together.  (R. 95).  She helps give her dog baths.  (R. 96).  She prepares the

family's dinners.  (R. 97).  She does not do yard work because it hurts her back.  She

does housework and laundry.  She doesn't do any house or car repairs.  (R. 97).  She

drives, and grocery shops with her son's help.  (R. 98).  She stated on one portion of the

form that she can only walk 10 to 20 minutes at a time, but on another portion of the

form she stated that she can walk 10 minutes to one hour.  (R. 100).  She stated that

she can lift only five to 10 pounds.  (R. 100).  Plaintiff also filled out a Personal Pain

Questionnaire on which she stated that she feels pain in "low back & hip joint traviling

[sic] to outer hip to thigh towards knee (l) side.  Upper kneck [sic] shoulder area.  (R)

heel of foot.  Constant nagging aching pain."  (R. 103).  She stated that she has "good

days & bad pain days[.]  I try to deal with the best I can w/ rest-naps-meds."  (R. 104).

### E.     The Administrative Hearing

The administrative hearing was held on April 26, 2007. (R. 479).  Plaintiff was

represented by attorney Alexander Weir III at the hearing.  Plaintiff and Vocational

Expert Bruce Magnuson (VE) testified at the hearing.

Plaintiff testified that the last time she worked was four months earlier, in

December of 2006, as a home care provider for her mother.  (R. 484).  Plaintiff was paid

eight dollars an hour by the county to perform that work.  (R. 485).  She performed that

work approximately eight hours per week for about four to six months.   (R. 486).  Prior

to that, she worked for ten or eleven days for the state fair doing janitorial work.  (R.

487-488).  Plaintiff has also worked providing home care for others.  (R. 488-489).  She

worked as a school bus driver in the late 1990's and as a security guard, telemarketer,

and grocery store cashier.  (R. 507-510).  Plaintiff testified that she has a car and can

drive.  (R. 489).

Plaintiff testified that she can no longer do home care work due to chronic pain,

troubles with her back, migraines, and dizzy spells.  (R. 489-490).  She testified that she

can sit for 15 or 20 minutes before her back becomes a problem and she has to get up

and walk around a little bit.  (R. 493).  She testified that she can stand or walk for about

15 or 20 minutes at a time.  (R. 493).  Plaintiff tries to avoid stooping and crouching

because that makes the muscle in the middle of her spine feel like it's going to give out,

and causes her more pain.  (R. 495).  She testified that she can lift less than ten

pounds.  (R. 495).  Plaintiff also testified that she has migraines two to three times per

week, and that they sometimes last all day and all night.  (R. 496).  She takes Vicodin

and Lexapro for the headaches, and they help, although they do not make the

headaches go away.  (R. 497).  Plaintiff testified that due to her depression she cries a

lot, and she has a hard time with stress.  She worries and has difficulty sleeping and

concentrating.  (Rec 499).

The VE testified that Plaintiff's past jobs fall into the exertional categories of

sedentary, light, and medium.  (R. 512).

**ANALYSIS**

**A.     Determination of Disability**

An individual

> shall be determined to be under a disability only if his  physical
> or mental . . . impairments are of such severity that he is not
> only unable to do his previous work but cannot, considering his
> age, education, and work experience, engage in any other kind
> of substantial gainful work which exists in the national
> economy.[1]

Disability requires more than the mere inability to work without pain.[2]

Whether a person has a "disability" supporting entitlement to Social Security

benefits is determined using a five-step sequential evaluation process, which considers

whether the claimant:

(1) worked during the alleged period of disability;
(2) has a severe impairment;
(3) has a condition which meets or equals the severity of a listed impairment;

_____

[1]42 U.S.C. § 423(d)(2)(A).

[2]Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989).

(4) can return to his or her past relevant work; and

(5) if not, whether he or she can perform other work in the national economy.[3]

If a determination can be made at any step, it is not necessary to proceed to the next step of the analysis.[4]

A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities."[5]  Basic work activities means "the abilities and aptitudes necessary to do most jobs."[6]  This includes:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.[7]

## B.    The ALJ's Decision

The ALJ's written decision applied the five-step sequential analysis.  At step one, the ALJ determined Plaintiff had engaged in substantial gainful activity from January 2002 through December 2002.  (R. 21-22).  The ALJ determined that Plaintiff's earnings

---

[3]20 C.F.R. § 404.1520(a)(4) (2008); see also Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).  The claimant bears the burden of establishing a prima facie case of disability at steps one through four. Id. at 751, n.2.  If claimant is successful, the burden of proof falls on the Commissioner to establish the requirements of step five. Id. at 751.

[4]20 C.F.R. § 404.1520(a)(4).

[5]20 C.F.R. § 404.1520(c).

[6]20 C.F.R. § 404.1521(b).

[7]Id.

in 2003, 2004, 2005, and 2006 were not sufficient to qualify as substantial gainful activity.  (R. 22).  However, he concluded that Plaintiff's earnings during those years "do demonstrate [Plaintiff's] ability to perform work activity and are relevant to the determination of her residual functional capacity."  (R. 22).

At step two, the ALJ determined that Plaintiff has the following severe impairments: a back disorder (degenerative disc disease of the lumbar spine and cervical spine), and plantar fasciitis.  (R. 22-23).  He determined that Plaintiff has medically determinable impairments of mental depression (dysthymia) and an anxiety disorder, but that these impairments do not constitute severe mental impairments.  (R. 23-25).

At step three, the ALJ determined that Plaintiff's impairments do not meet or equal the requirements in the Listing of Impairments in order to be considered a presumptive disability.  (R. 25).

Before proceeding to step four, the ALJ was required to determine Plaintiff's "residual functional capacity" (RFC), which is her ability to perform work on a regular and continuing basis despite her impairments.[8]  The ALJ found that Plaintiff has a residual functional capacity consistent with the full range of medium work.  (R. 26).  He determined that she can lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, can stand and/or walk for six hours out of an eight-hour workday,

---

[8]A claimant's RFC is his or her ability to perform work on a regular and continuing basis despite his or her impairments.  20 C.F.R. 404.1545.  The ALJ must determine the claimant's RFC before proceeding to step four.  20 C.F.R. § 404.1520(a)(4).

15

and can sit for six hours out of an eight hours workday, with normal breaks.  (R. 26).

The ALJ stated that,

> [m]y assessment is consistent with the evaluation of the evidence by the State Agency medical consultant [citation to the June 8, 2005, Physical Residual Functional Capacity Assessment form completed by State Agency medical consultant Janet Weldon (R. 373-380)].  It is also generally consistent with the other medical evidence of record, which reflects that the claimant has responded to treatment well.  I discount and give no weight to the opinion of Dr. Ortegon that the claimant is "disabled."  This opinion is on an issue that is reserved to the Commissioner.  Moreover, this opinion is not supported by clinical findings or objective medical tests and is not supported by Dr. Ortegon's own notes of treatment.  It is also inconsistent with the other medical opinion of record, which reveals a good level of physical functioning.

(R. 26).

After setting forth his RFC determination, the ALJ proceeded to make the

following specific finding concerning the Plaintiff's credibility:

> The claimant complains of a significant level of pain secondary to musculoskeletal impairments.  However, the record reveals that the claimant's pain is controllable with appropriate medical treatment.  On May 12, 2004, Dr. Ortegon noted that the claimant's pain was well-controlled with compliance with treatment.  The claimant's allegation of excess pain is not supported by the credible evidence of record, which reveals conservative treatment, erratic treatment compliance by the claimant, and the claimant's ability to perform a full range of activities of daily living, including caring for her children.  There is no record of significant side effects from medication.

(R. 26 (citations omitted)).

At step four, the ALJ determined that Plaintiff is able to perform her past relevant

16

work as a security guard, telephone solicitor, and cashier.  (R. 27).  All of these jobs fall

under the light or sedentary exertional level.  (R. 27).  Because the ALJ found that

Plaintiff can perform this past relevant work, he did not proceed to step five of the

analysis.  The ALJ concluded that Plaintiff is not disabled under the Social Security Act

and thus is not entitled to Social Security disability benefits.  (R. 27-28).

### C.    Standard of Review

When a district court reviews the Commissioner's decision to deny Social

Security benefits, the Court's only job is to determine whether the Commissioner's

factual findings are supported by substantial evidence in the record as a whole, and

whether the correct legal standards were applied.[9]  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.[10]  Since review is based on the record as a whole, the entire record must be

examined to determine whether the evidence supporting the decision is substantial,

taking "into account whatever in the record fairly detracts from its weight."[11]  However,

the Court may neither reweigh the evidence nor substitute its discretion for that of the

ALJ.[12]

---

[9]Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).

[10]Id.

[11]Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004) (quoting Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994)).

[12]White v. Massanari, 271 F.3d 1256, 1257 (10th Cir. 2001).

**D.      Plaintiff's Arguments**

**1.      The ALJ's RFC Finding**

While Dr. Ortegon had stated that Plaintiff can lift less than 10 pounds, sit only

four hours in an eight-hour workday, be on her feet less than half an hour in an eight-

hour workday (R. 415), the ALJ found that Plaintiff can lift and/or carry up to 20 pounds

occasionally and up to 10 pounds frequently, can stand and/or walk for six hours out of

an eight-hour workday, and can sit for six hours out of an eight hours workday, with

normal breaks.  (R. 26).  Plaintiff argues that the ALJ improperly allowed the RFC

determination of the State Agency medical consultant, Janet Weldon, to outweigh the

opinion of Plaintiff's treating physician, Dr. Ortegon, which, Plaintiff argues, should have

been given controlling weight.

A treating physician's opinion should be given controlling weight "if it is well

supported by clinical and laboratory diagnostic techniques and if it is not inconsistent

with other substantial evidence in the record."[13]  If the ALJ determines, under that

analysis, that the opinion is not entitled to controlling weight, then he or she must

proceed to weigh the opinion using the factors set forth in 20 C.F.R. §§ 404.1527 and

416.927, namely,

> (1) the length of the treatment relationship and the frequency
> of examination; (2) the nature and extent of the treatment
> relationship, including the treatment provided and the kind of
> examination or testing performed; (3) the degree to which
> the physician's opinion is supported by relevant evidence; (4)

---

[13]Bean v. Chater, 77 F.3d 1210, 1214 (10th Cir. 1995) (citation omitted).

consistency between the opinion and the record as a whole;
(5) whether or not the physician is a specialist in the area
upon which an opinion is rendered; and (6) other factors
brought to the ALJ's attention which tend to support or
contradict the opinion.[14]

However, not every factor applies in every case, and the ALJ need not explicitly discuss

each factor, as long as he provides good reasons for the weight that he ultimately

affords the treating physician's opinion.[15]  If the ALJ rejects the treating physician's

opinion, he must give specific, legitimate reasons for doing so.[16]

Here, the ALJ did provide specific, legitimate, reasons for rejecting Dr. Ortegon's

opinion concerning Plaintiff's RFC.  The ALJ stated that Dr. Ortegon's opinion conflicts

with the "other medical opinion of record, which reveals a good level of physical

functioning," and that the other medical evidence of record "reflects that the claimant

has responded to treatment well."  (R. 26).  There is indeed substantial evidence in the

record indicating that Plaintiff's physical problems are well controlled with treatment,

some of it from Dr. Ortegon himself.  On June 10, 2005, Dr. Ortegon stated that Plaintiff

"is doing very well . . . .  Her generalized aches and pains and chronic pain syndrome

are more or less better."  (R. 379).  Dr. Giarratano reported on April 25, 2005, that the

pain in Plaintiff's heel had "subsided quite a bit" after her cortisone injection.  (R. 435).

While Dr. Giarratano stated in March 2007 that Plaintiff can only be on her feet for two

---

[14]Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (internal quotation and citation omitted).

[15]Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007).

[16]Hamlin, 350 F.3d at 1301.

to three hours in an eight hor workday, or "to tolerance," he also stated that he did not

know whether her last cortisone injection in July 2006 had worked since Plaintiff hadn't

been back see him.  On August 6, 2004, Dr. Ortegon stated that Plaintiff's "pain

continues to improve" with medication.  (R. 240).  Earlier that month, he stated that

Plaintiff "does very well when she is controlled with her medication."  (R. 239).  Dr.

Ortegon stated on June 4, 2004, that Plaintiff's "pain is much better."  (R. 241).  Two

years prior, he wrote that Plaintiff does "very well" when she takes her medications.  (R.

242).  Additionally, Plaintiff reported that she is able to cook meals for her family and

clean up, do housework and laundry, drive, and grocery shop.  (R. 95-104).  Further,

Plaintiff performed some work every year from 2001 through 2006, after her alleged

disability onset date.  (R. 21).  The ALJ gave legally sufficient reasons for rejecting Dr.

Ortegon's RFC assessment.

### 2.    The ALJ's Determination that Plaintiff Does Not Have a Severe Mental Impairment

Plaintiff also argues that the ALJ erred by rejecting Dr. Hopkins' opinions

concerning Plaintiff's mental impairment and instead accepting the opinion of Dr.

Glasco, the nonexamining State agency psychiatrist, that Plaintiff does not have a

severe mental impairment.  The ALJ gave legally sufficient reasons for affording "little

weight" to Dr. Hopkins' opinion.  Specifically, the ALJ stated that Dr. Hopkins' diagnosis

of personality disorder "is not made elsewhere in the medical evidence of record.

Furthermore, the record reflects that the claimant has indeed experienced a set of

personal crises, including being the victim of domestic violence, losing her job, and

losing her home.  Such crises were not manufactured by the claimant and therefore

hardly support a diagnosis of borderline personality disorder."  (R. 25).  The ALJ stated

that he concurred with Dr. Glasco's assessment because

> [t]he medical evidence of record clearly indicates that the
> claimant's depression and anxiety, although real, are readily
> ameliorated to a nearly non-existent level with compliance
> with medication.  As discussed above, the record indicates
> quick and excellent response to treatment with psychotropic
> medication.  Therefore I conclude that the claimant's mental
> impairments have resulted in no restrictions of her activities
> of daily living, and have caused only mild difficulties in
> maintaining concentration, persistence, and pace.  There is
> no evidence of any psychiatric hospitalizations or other
> instances of extreme psychotic behavior.  The claimant's
> mental impairments have not caused any episodes of
> decompensation of extended duration.  Consequently,
> pursuant to 20 CFR 414.1520a(d)(1) and 20 CFR
> 416.920a(d)(1), I conclude that the claimant does not have a
> "severe" mental impairment.

(R. 25).  There indeed is substantial evidence in the record indicating that Plaintiff's

mental impairment or impairments are well-controlled when she takes prescribed

psychotropic medications.  Dr. Hopkins himself opined in April 2005 that Plaintiff

functions well when she takes her medications and that she is able to participate in the

job market.  While he later opined that Plaintiff has "some features of borderline

personality disorder," he simultaneously noted that Plaintiff was not taking her

prescribed medication at the time.  The ALJ provided legally sufficient reasons for

affording little weight to Dr. Hopkins' December 2006 opinion.

### 3.   Consideration of Plaintiff's Migraine Headaches

Plaintiff argues that the ALJ erred in failing to mention the December 2006 questionnaire on which Dr. Ortegon stated that Plaintiff suffers from migraine headaches.  In fact, the ALJ's decision does not mention Plaintiff's claim of disabling migraines at all.  Plaintiff testified at the hearing that she experiences migraines two to three times per week, that they sometimes last all day and all night, and that while medications help, they do not make the migraines go away.  There is medical evidence in the record concerning Plaintiff's reports of migraines in 2000, 2001, and 2004. Defendant argues that because the effects of migraines are subjective, the ALJ's general findings concerning Plaintiff's credibility apply to her claim of severe migraines. However, the ALJ's credibility findings addressed Plaintiff's complaints of pain "secondary to her musculoskeletal impairments," which does not necessarily indicate a consideration of pain from migraines.  It is not clear from the record that the ALJ considered any of the evidence concerning Plaintiff's migraine headaches.  The Court cannot, on this appeal, weigh that evidence itself.[17]  **Thus, the matter will be reversed and remanded for consideration and evaluation of the evidence concerning Plaintiff's migraine headaches.**[18]

---

[17]White, 271 F.3d at 1257.

[18]See Baker v. Bowen, 886 F.2d 289, 291 (10th Cir. 1989) ("Where the record on appeal is unclear as to whether the ALJ applied the appropriate standard by considering all the evidence before him, the proper remedy is reversal and remand.").

Accordingly, it is

ORDERED that the June 27, 2007, written decision of Administrative Law Judge Alexander Weir III is reversed.  It is

FURTHER ORDERED that this case is remanded to the Administrative Law Judge for reconsideration under Sentence Four of section 205(g) of the Social Security Act,  42 U.S.C. § 405(g), consistent with the Court's findings and conclusions.  It is

FURTHER ORDERED that on remand the ALJ is instructed to provide the necessary consideration and evaluation as explained above.

DATED at Denver, Colorado, this 22nd day of March, 2011.

BY THE COURT:

ZITA LEESON WEINSHIENK, Senior Judge
United States District Court